UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| METRO TREATMENT OF MAINE, | ) | |
| LP d/b/a PENOBSCOT COUNTY | ) | |
| METRO TREATMENT CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16-cv-00433-JAW |
| | ) | |
| CITY OF BANGOR, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON THE PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

Plaintiff alleges that the City of Bangor violated the Americans with Disabilities Act and the Rehabilitation Act because Chapter 93 of Bangor's Code of Ordinances is discriminatory on its face and because the City Council acted on discriminatory prejudice in denying Plaintiff's permission to expand its methadone clinic. Plaintiff moves for a preliminary injunction, enjoining the City of Bangor from enforcing Chapter 93 against it or ordering the City Council to grant Plaintiff's application for permission to expand the clinic without delay. After an analysis of the preliminary injunction factors, the Court denies the Plaintiff's motion because it has failed to demonstrate irreparable harm to itself or its clients.

## I.    BACKGROUND

### A.    Procedural Background

On August 23, 2016, Metro Treatment of Maine, LP d/b/a Penobscot County Metro Treatment Center (Penobscot Metro) filed a complaint against the city of

Bangor (Bangor) alleging discrimination in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (ADA), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq. Compl.* (ECF No. 1).  On the same day, Penobscot Metro moved for a preliminary injunction, *Mot. for Prelim. Inj.* (ECF No. 3) (*Pl.'s Mot.*), and for expedited consideration of that motion.  *Pl.'s Mot. for Expedited Consideration* (ECF No. 4).  In its motion for expedited consideration, Penobscot Metro asked for an expedited briefing schedule and an expedited hearing.  *Id.* at 1. The Court held a telephone conference on September 1, 2016.  *Min. Entry* (ECF No. 10).  As it turned out that neither Penobscot Metro nor Bangor was requesting a hearing, the Court denied the motion to expedite a hearing that would not take place. *Order* (ECF No. 11).  The Court did, however, set an expedited briefing schedule.  *Id.* On September 16, 2016, Bangor objected to Penobscot Metro's motion for preliminary injunction.  *Def.'s Obj. to Pl.'s Mot. for Prelim. Inj.* (ECF No. 13) (*Def.'s Opp'n*). Penobscot Metro replied to Bangor's objections on September 21, 2016.  *Pl.'s Reply in Supp. of Mot. for Prelim. Inj.* (ECF No. 16) (*Pl.'s Reply*).

### B.    The Allegations in the Complaint

Penobscot Metro is a limited partnership that operates a methadone treatment clinic in Bangor, Maine.  *Compl.* ¶ 2.  Methadone clinics provide treatment to patients recovering from addiction to legal prescription opiates and illegal drugs, such as heroin and fentanyl.  *Id.* ¶ 6.  This treatment includes behavioral therapy or counseling and the administration of methadone in controlled doses under strict medical supervision.  *Id.* ¶¶ 7, 8.

2

Methadone clinics must obtain two types of licenses from the state of Maine: 1) a license from the Division of Licensing and Regulatory Services of the Department of Health and Human Services, and 2) a license from the Pharmacy Board. *Id.* ¶ 9. Under federal law, methadone clinics are regulated by the Drug Enforcement Agency and must follow guidelines and rules prescribed by the Substance Abuse and Mental Health Services Authority. *Id.* ¶ 10.

Penobscot Metro is licensed by the state of Maine to provide methadone treatment to 300 patients. *Id.* ¶ 12. Penobscot Metro claims that as of August 1, 2016, it had a waitlist of over 170 additional people who wish to receive methadone treatment, and that it gets daily calls from individuals who desire treatment inquiring whether they can be served. *Id.* ¶¶ 12, 13.

Because there are more people seeking methadone treatment in the Bangor area than available methadone-clinic spaces to serve them, Penobscot Metro decided to expand its facility. *Id.* ¶ 14. In March of 2016, Penobscot Metro completed construction of upgrades and improvements needed to accommodate 200 additional patients, for a total of 500 patients. *Id.* ¶ 15. That same month, the Bangor Code Enforcement Office issued Certificates of Occupancy documenting that Penobscot Metro had met applicable building code requirements. *Id.* Penobscot Metro has obtained all state certifications and licenses it needs to operate a clinic that serves 500 patients and has met the requirements of federal law. *Id.* ¶ 16. All that remains for Penobscot Metro to serve a total of 500 patients is for Bangor to sign off on the expansion. *Id.*

In June of 2016, Penobscot Metro applied to the Bangor City Council for approval of the expansion pursuant to Chapter 93 of the Bangor Code of Ordinances. *Id.* ¶ 17.  Chapter 93 bars the establishment of "chemical dependency treatment facilities . . . that provide methadone maintenance treatment" in the city of Bangor. *Id.* ¶ 18 (quoting BANGOR, ME., CODE ch. 93, § 93-1 (2005) (CODE)).  Chapter 93 also bars existing facilities from expanding.  *Id.* ¶ 19 (citing CODE § 93-2).  However, Chapter 93 does permit existing facilities to "apply to the City for a license to increase the number of patients that it may treat at its existing facility" if five conditions are met:

> A.    The property is adequate to accommodate the proposed increase, including providing sufficient interior space to avoid patient queuing on sidewalks, parking area, and other areas outside of the facility;
> B.    The treatment program is able to hire and retain adequate numbers of qualified staff to meet applicable state and federal standards of care;
> C.    The applicant has demonstrated a need for increased services that cannot be reasonably met except by the increase in the permitted number of patients at its existing location;
> D.    The applicant is in compliance with all state or federal laws, rules or regulations regarding its opioid treatment program; and
> E.    The applicant is in compliance will [sic] all City codes and ordinances.

*Id.* ¶ 20 (quoting CODE § 93-5).  Section 93-6 further provides that "the City Council may consider the geographic locations of patients and potential patients and may deny the application if it determines that there is sufficient patient demand to warrant a treatment facility in an area geographically closer to current and potential future patients."  *Id.* ¶ 22 (quoting CODE § 93-6).  Penobscot Metro alleges that at hearings held on August 1 and 8, 2016, it demonstrated to the City Council that the

five conditions under section 93-5 had been met. *Id.* ¶ 21.  It further alleges that the Council did not make a determination based on the geographic location of patients and potential patients under section 93-6. *Id.* ¶ 22.

While Penobscot Metro's application for permission to expand under Chapter 93 was pending, the City Council received emails from Bangor residents that Penobscot Metro claims "demonstrated discriminatory prejudice against recovering drugs addicts based on the false premise and stereotype that methadone clinic patients are criminals who disrupt communities where methadone clinics are located." *Id.* ¶ 23.

At a July 11 meeting of the City Council, Councilors David Nealley and Benjamin Sprague voiced concerns about what they believed would happen if Penobscot Metro expanded. *Id.* ¶ 29.  Penobscot Metro claims that "[w]hile citizens and city councilors expressed the view that the location or expansion of a methadone clinic in a city causes crime to increase or other negative consequences, no facts or empirical evidence to that effect were presented to the City Council." *Id.* ¶ 30. Penobscot Metro alleges that on the contrary, it presented evidence to the City Council that the location or expansion of a methadone clinic in a city actually causes crime to decrease. *Id.* ¶¶ 31, 32.

In July of 2016, Penobscot Metro wrote to the City Solicitor advising him that recovering drugs addicts are covered by the ADA, that Chapter 93 violates the ADA on its face by singling out methadone clinics for discriminatory treatment, and that a decision to deny expansion would also violate the ADA. *Id.* ¶ 34.  On August 8,

2016, the City Council voted 7 to 2 to deny permission for Penobscot Metro to expand; those who voted against the expansion explained that they did so because they questioned the need for additional methadone treatment slots in Bangor. *Id.* ¶¶ 35, 36. Penobscot Metro claims that the evidence in the record shows that additional slots were needed. *Id.* ¶ 37. It also states that "[r]ecovering drug addicts who are unable to obtain methadone treatment are at grave risk of returning to illegal drug use and experiencing severe adverse health consequences such as illness, permanent disability, and death." *Id.* ¶ 38.

## II.    THE PARTIES' POSITIONS

### A.    The Plaintiff's Motion

Penobscot Metro claims it satisfies the first factor of the preliminary injunction analysis and is likely to succeed on the merits because "(1) Chapter 93 violates the ADA on its face, and (2) even if it did not, the City acted on discriminatory prejudice in denying Penobscot Metro a permit to expand." *Pl.'s Mot.* at 9. Penobscot Metro states that the ADA is a federal civil rights statute designed to protect disabled individuals against discrimination by public entities or federal fund recipients based on their disabilities. *Id.* It says that Bangor is subject to both the ADA and Rehabilitation Act, which are analyzed under the same standards, because it is a public entity and a recipient of federal funds. *Id.* at 10. It states that individuals participating in drug rehabilitation programs are qualified individuals with disabilities protected by the statutes. *Id.* at 10-11. Penobscot Metro further claims it has standing to sue on behalf of its patients. *Id.* at 11-12.

Penobscot Metro argues that Chapter 93 discriminates against recovering drug addicts on its face "by expressly proscribing the establishment or expansion of 'chemical dependency treatment facilities . . . that provide methadone maintenance treatment' in the City." *Id.* at 12 (quoting CODE § 93-1). Citing caselaw, Penobscot Metro claims that an ordinance cannot single out methadone clinics for different procedures or adverse treatment. *Id.* at 12-13. It argues that because Chapter 93 "places obstacles in the path of anyone who seeks to open or expand a methadone clinic" that do not apply to other healthcare providers or businesses, it violates the ADA. *Id.* at 13.

Penobscot Metro additionally argues that Bangor's decision to deny Penobscot Metro a permit violated the ADA because it was based on "discriminatory prejudice." *Id.* It contends that "[w]hile city councilors who voted against the expansion claimed to be doing so because they questioned the need for additional methadone treatment slots in Bangor, the evidence in the record did not support that concern." *Id.* at 14. Penobscot Metro notes that "Bangor residents had submitted numerous public comments to the City Council and testified at the hearings expressing the view that methadone clinic patients disrupt communities where clinics are located by engaging in criminal activity." *Id.* It argues that these concerns are not supported by evidence, but are based on stereotypes and prejudice against recovering drug addicts. *Id.*

Citing caselaw, Penobscot Metro argues that "[a] municipality must demonstrate an objectively legitimate basis for discrimination" and that "[g]eneralized perceptions about disabilities and unfounded speculations about

7

threats to safety are specifically rejected as grounds to justify exclusion." *Id.* (citing *CRC Health Grp., Inc. v. Town of Warren*, No. 2:11-cv-196-DBH, 2014 U.S. Dist. LEXIS 76239, at *39 (D. Me. Apr. 1, 2014)).  Penobscot Metro claims that there is unmet demand for methadone treatment and that it demonstrated that it met the conditions for expansion; it argues that "[t]he explanation for the City Council's decision is therefore clear: it acted based on discriminatory prejudice to keep recovering drug addicts out of Bangor." *Id.* at 14-15.

Finally, as to the first factor, Penobscot Metro notes that the ADA does not apply if a defendant can demonstrate a significant risk to the health or safety of others, but claims that expanding the clinic would pose no such risk.  *Id.* at 15-17.

Penobscot Metro argues that the second factor for a preliminary injunction is satisfied because "[r]ecovering drug addicts who wish to receive methadone treatment are experiencing irreparable harm while Penobscot Metro is prevented from expanding to serve them." *Id.* at 17.  Penobscot Metro asserts that "[g]iven the strength of [its] showing on the likelihood-of-success-on-the-merits prong of the preliminary injunction analysis, its burden to establish irreparable harm if injunctive relief is not granted is lessened." *Id.* (citing *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996)).  But, it claims, it can establish irreparable harm even without the benefit of this sliding scale. *Id.* at 18.  It argues that in evaluating this prong courts have looked to the harm sustained by a clinic's patients. *Id.*  Additionally, it argues that when a defendant violates a civil rights statute, courts "will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation."

*Id.* at 18-19 (collecting cases). It claims that "[r]ecovering drug addicts who are unable to obtain methadone treatment are at grave risk of returning to illegal drug use and experiencing severe illness, permanent disability, and even death" and that "[g]iven the substantial unmet need for opiate addiction treatment in Bangor, the number of prospective patients who stand to suffer harm is significant." *Id.* at 19.

Penobscot Metro argues that it satisfies the third factor for a preliminary injunction because the balance of harms weighs in favor of an injunction. *Id.* Specifically, it argues that the harm would be severe to recovering drug addicts if Penobscot Metro were not permitted to proceed, whereas the requested relief "would simply require the City to let Penobscot Metro treat more patients." *Id.* It further contends that any concerns about increased crime are speculative. *Id.*

Finally, Penobscot Metro argues that it satisfies the fourth prong because a preliminary injunction would serve the public interest. *Id.* In particular, Penobscot Metro claims that the public will be served by "helping recovering drug addicts to overcome their addiction, avoid relapsing, and contribute to society as productive citizens." *Id.* at 19-20.

### B.   The City's Opposition

First, Bangor claims that Penobscot Metro is not likely to succeed on the merits because it has failed to show facial discrimination. *Def.'s Opp'n* at 5. It states that the ADA permits states and municipalities to regulate the operation, including licensing and certification, of Title II entities such as Penobscot Metro. *Id.* It argues that Penobscot Metro's reliance on cases that deal with zoning ordinances is misplaced because here, Penobscot Metro is not seeking to establish a new clinic or

being prohibited from operating its current clinic. *Id.* at 5-6. It says that Bangor has adopted the same licensing procedures enacted by the state of Maine and DHHS and claims that these regulations for expansion are "a permissible means for the City and State to license the ongoing operation of Penobscot Metro's facility." *Id.* at 7.

Additionally, Bangor argues that the decision to deny the expansion was not based on discriminatory prejudice, but "[i]nstead, as the meeting transcripts make clear, Penobscot Metro's request to add patients was denied because of a majority of the City Councilors made a factual determination that Penobscot Metro had not demonstrated that there was a need for increased services that could not be reasonably met." *Id.* Specifically, the City contends that when Penobscot Metro initially submitted the application there was a waitlist of 173 individuals, but that by the time of the City Council meeting on August 1, 2016, there were only a total of 60 people interested and able to be contacted. *Id.* at 7-8. Additionally, Bangor points out that Mr. Harrison "admitted that the waitlist described was not exclusive to Penobscot Metro, but was a waitlist for methadone treatment in general" and that "it was impossible to advise the Council as to how many of the sixty (60) people . . . were going to be appropriate for treatment." *Id.* at 8-9. Bangor also notes that "[t]he record before the City Council made clear that other treatment facilities were available to provide similar services without a wait." *Id.* at 10. It also points to a previous time that the City permitted expansion of another methadone facility in Bangor. *Id.* at 11. It argues that "[g]iven that the City Councilors made factual findings consistent with

the evidence they received, Plaintiff's assertion that there must have been discrimination is meritless." *Id.*

Bangor also argues that Penobscot Metro cannot satisfy the second prong because it cannot show irreparable harm. *Id.* It claims that Penobscot Metro can only identify "potential harm" that recovering addicts will potentially relapse and return to illegal drug use which could "potentially result in death, illness or permanent disability" and that "such speculative harm will not suffice." *Id.* Further, it argues that the cases on which Penobscot Metro relies are inapposite because they deal with clinics that faced shut downs that would impact current patients or clinics that were the sole provider of services in that area, but here, Penobscot Metro is one of several facilities offering methadone treatment in the area, so there is no danger of interruption of services and the patients on the waitlist have other options. *Id.* at 12.

Bangor argues that Penobscot Metro has not satisfied the third factor because the balance of harms weighs against an injunction. *Id.* at 13. It states that the potential harm is not sufficient to show irreparable harm and that the same services are being offered at another facility in Rockland. *Id.* On the other hand, Bangor argues that it would be harmed if Penobscot Metro "is allowed to undermine its power by essentially forcing a change to the licensing provisions of Chapter 93 without going through the proper administrative procedures." *Id.*

Finally, Bangor claims that Penobscot Metro has not satisfied the fourth factor for a preliminary injunction because the public interest will be served by denying the

injunction.  *Id.*  It argues that the state has a strong interest in regulating medical facilities and ensuring that licenses are granted or amended only when the need for the facility is properly established and that the public has a strong interest in the integrity and orderly functioning of the state's administrative procedures.  *Id.* at 13-14.  It claims that "[t]o permit an injunction would allow Plaintiff to effectively bypass the valid licensing procedure and expand without oversight, which would supplant the role of DHHS and the City Councilors to insure that methadone treatment facilities are necessary and properly licensed."  *Id.* at 14.

### C.   The Plaintiff's Reply

In reply, Penobscot Metro maintains that Chapter 93 singles out methadone clinics for special discriminatory treatment not applicable to other healthcare providers and states that Bangor offers no legitimate non-discriminatory reason for its ordinance.  *Pl.'s Reply* at 1.  Penobscot Metro also argues that Chapter 93 is not identical to the state law, and even if it were, "[i]t is not a defense to a federal civil rights claim against a municipality that the state may be violating federal law too."  *Id.* at 2.  It further argues that nothing in the ADA suggests that it only applies to zoning and states that this Court has said that "public entities may not administer *licensing programs* in 'a manner that subjects qualified individuals with disabilities to discrimination on the basis of a disability.'"  *Id.* (quoting *Kelley v. Mayhew*, 973 F. Supp. 2d 31, 38 (D. Me. 2013)) (emphasis added by Penobscot Metro).

In response to Bangor's argument that it denied the application because other treatment centers had availability, Penobscot Metro argues that there is no evidence that the other treatment facilities in Bangor actually have the capacity to serve the

waitlist. *Id.* at 3. Penobscot Metro also asserts that its Rockland facility does not accept MaineCare and notes that Rockland is a three-hour roundtrip from Bangor and thus not an option for many recovering drug addicts. *Id.* at 3-4. Further, it argues that evidence that Bangor permitted expansion in the past is not evidence that it is not discriminating in this instance. *Id.* at 4.

Penobscot Metro also replies to the argument that any irreparable harm is purely speculative and without empirical basis, stating that "it is all but certain that some of those who are unable to get methadone treatment will suffer grave adverse consequences." *Id.* at 5 (citing *Pl.'s Mot.* Attach. 1, *Decl. of Lisa Davis* ¶ 20 (*Davis Decl.*)). It also argues that blocking Penobscot Metro's expansion would create a "long-term impediment to methadone treatment in the Bangor area." *Id.* at 6. It reiterates that irreparable harm is presumed if a defendant violates a civil rights statute. *Id.* at 7.

Finally, Penobscot Metro argues that the severe and tangible injuries recovering addicts would experience if the Court were to deny injunctive relief should be the primary concern and should outweigh any undermining of Bangor's exercise of "power" that might later prove unjustified. *Id.* In other words, Penobscot Metro argues that if the Court errs, it should err on the side of the people who need treatment, since the harm from a judicial error caused by granting the injunction could be remedied by reinstating Bangor's ordinance, but the harm to prospective patients denied treatment can never be rectified. *Id.*

## III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012); *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). When deciding whether to grant a motion for preliminary injunction, the Court must carefully weigh four factors. *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006). These factors include:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant]; (3) the balance of the relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Id.* (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18. However, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is the "most important part of the preliminary injunction assessment") (citation omitted). Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of [preliminary injunctive] relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## IV.   DISCUSSION

### A.   Standing

A threshold question is whether Penobscot Metro has standing to request injunctive relief.  An association or organization may assert standing on its own behalf or as the representative of its members.  *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *Hunt v. Wash. State Apple Advert. Comm.*, 432 U.S. 333, 341-42 (1977).  If Penobscot Metro may not sue on behalf of its clients, its own damages—as opposed to its clients' damages—would likely be purely monetary and insufficient to obtain injunctive relief.

In its memorandum, Penobscot Metro asserts that "[t]his Court has twice held that '[a] treatment provider such as [a methadone clinic] has standing to sue on its own behalf when "denied a zoning permit because it cares for and/or associates with individuals who have disabilities."'"  *Pl's. Mot.* at 11 (citing *CRC Health Grp.*, 2014 U.S. Dist. LEXIS 76239, at *27 and *Fuller-McMahan v. City of Rockland*, No. 05-58PH, 2005 WL 1645765, at *6 (D. Me. July 12, 2005)).  The Court agrees that Penobscot Metro has standing to bring an ADA claim on its own behalf under the unique language of Title II.  *See Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) (Title II's enforcement provision extends relief to "*any person* alleging discrimination on the basis of disability") (quoting 42 U.S.C. § 12133) (emphasis in original).

The next question is whether Penobscot Metro's Title II standing authorizes it to claim injunctive relief.  The issue is complicated by the conclusion that in pursuing a Title II claim, a methadone clinic is suing not merely on behalf of its clients, but

also on its own behalf.  *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002) ("Plaintiff is not an association suing solely on behalf of its members.  Instead, it is an entity suing primarily on its own behalf, because of injury it suffered as a result of its association with individuals with disabilities").  Furthermore, a plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

Here, Bangor did not address whether Penobscot Metro has standing to demand injunctive relief.  Therefore, for purposes of the pending motion for preliminary injunction, the Court assumes Penobscot Metro has standing to obtain injunctive relief on behalf of its clients.  *See RHJ Med. Ctr., Inc. v. City of DuBois*, 564 F. App'x 660, 664 (3rd Cir. 2014) ("It is now well established that 'the proprietors of a proposed methadone treatment facility have standing to seek relief both on their own behalf and on behalf of their clients under both the ADA and Rehabilitation Act'") (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 (3rd Cir. 2007)).

**B.      The Likelihood of Success on the Merits**

To demonstrate likelihood of success on the merits, plaintiffs must show "more than mere possibility" of success—rather, they must establish a "strong likelihood" that they will ultimately prevail. *Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (quoting *Winter*, 555 U.S. at 22).  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Section 504 of the Rehabilitation Act of 1973 prohibits the same type of discrimination by a recipient of federal funds: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  "Claims under Title I of the ADA and § 504 of the Rehabilitation Act are analyzed under the same standards." *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 23 n.2 (1st Cir. 2001) (citing *EEOC v. Amego, Inc.*, 110 F.3d 135, 143 (1st Cir. 1997)).  Like the parties, the Court refers only to the ADA as shorthand for claims under both acts. *Pl.'s Mot.* at 10; *Def.'s Opp'n* at 5 n.1.

Preliminarily, the Plaintiff may maintain an ADA claim against Bangor.  Title II expressly applies to any "public entity," 42 U.S.C. § 12132, which is defined to mean "any State or local government."  42 U.S.C. § 12131(1)(A); *see also Skinner v. Salem Sch. Dist.*, 718 F. Supp. 2d 186, 193 (D.N.H. 2010) ("[T]here is no question that Congress intended for the statute to apply to state and local government entities. . . .").

To prevail on a Title II ADA claim, a plaintiff must demonstrate:

(1) that he is a qualified individual with a disability;
(2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and
(3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*CRC Health*, 2014 U.S. Dist. LEXIS 76239, at *26-27 (quoting *Buchanan v. Maine*, 469 F.3d 158, 170-71 (1st Cir. 2006)).

### 1.   Qualified Individual with a Disability

Penobscot Metro maintains that "[t]he ADA bars discrimination against recovering drug addicts and treatment providers who serve them." *Pl.'s Mot.* at 10. Bangor has not objected to Penobscot Metro's assertion. The Court agrees. "Drug addiction is an 'impairment' for purposes of the ADA." *CRC Health*, 2014 U.S. Dist. LEXIS 76239, at *33 (citing 28 C.F.R. § 35.104); *Jones v. City of Boston*, 752 F.3d 38, 58 (1st Cir. 2014) ("Individuals who are recovering from an addiction to drugs may be disabled in the meaning of the ADA, as the statute aims to protect them from the stigma associated with their addiction"); *A Helping Hand, LLC v. Baltimore Cty., Md.*, 515 F.3d 356, 367 (4th Cir. 2008) ("Unquestionably, drug addiction constitutes an impairment under the ADA").

### 2.   Discrimination

Penobscot Metro is asserting that Bangor discriminated against it and its clients in two ways: (1) by singling out methadone clinics for special regulation, Penobscot Metro says Bangor's ordinance discriminates "on its face" in violation of the ADA; and (2) if Chapter 93 of the Bangor ordinance were not facially discriminatory, Penobscot Metro contends Bangor discriminated against it and its clients by the way Bangor applied Chapter 93. *Pl.'s Mot.* at 12-15. Penobscot Metro correctly states that the contested provisions of Bangor's ordinance apply only to methadone clinics.   Sections 93-1 and 93-2 expressly apply only to "chemical dependency treatment facilities . . . that provide methadone maintenance treatment." *Compl.* ¶¶ 18-19; *Def.'s Answer and Affirmative Defenses to Pl.'s Compl.* ¶¶ 18-19.

### a.   Facial Discrimination

Although the First Circuit has not directly addressed this issue, the Third, Sixth, and Ninth Circuits have held that "a law that singles out methadone clinics for different zoning procedures is facially discriminatory under the ADA and the Rehabilitation Act." *New Directions*, 490 F.3d at 305; *MX Group*, 293 F.3d at 344-45; *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730-37 (9th Cir. 1999); *see Habit Mgmt., Inc. v. City of Lynn*, 235 F. Supp. 2d 28, 29 (D. Mass. 2002); *THW Grp., LLC v. Zoning Bd. of Adjustment*, 86 A.3d 330, 342-43 (Pa. Commw. Ct. 2014); *Freedom Healthcare Servs., Inc. v. Zoning Hr'g Bd.*, 983 A.2d 1286, 1292 (Pa. Commw. Ct. 2009) ("Simply put, a methadone clinic cannot be treated differently than a medical clinic that is serving as an ordinary medical clinic").  In *CRC Health*, this District applied this principle to a moratorium that singled out methadone clinics for less favorable treatment than other facilities, including medical facilities.  2014 U.S. Dist. LEXIS 76239, at *36.

Bangor's primary defense to facial discrimination is to point out that its ordinance is a licensing ordinance, not a zoning ordinance. *Def.'s Opp'n* at 6-7.  It is true that the ADA does not prohibit public entities from exercising licensing authority.  As Bangor argues, "[t]he ADA permits states and municipalities to regulate the operation, including licensing and certification, of Title II entities such

19

as Penobscot Metro." *Def.'s Opp'n* at 5 (citing *Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63, 69 (2d Cir. 2012)).[1]

However, in *Noel*, the Second Circuit cited 28 C.F.R. § 35.130(b)(6), which reads in part:

> A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability.

28 C.F.R. § 35.130(b)(6).  These regulations go on to provide that a public entity must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  Similarly, the regulations prohibit a public entity from imposing "eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."  28 C.F.R. § 35.130(b)(8).

---

[1]    Although not germane to this discussion, the Second Circuit concluded that the ADA required New York's Taxi and Limousine Commission not to refuse to grant licenses to persons with disabilities who are otherwise qualified to own or operate a taxi, but the ADA did not "assist persons who are consumers of the licensees' product."  *Noel*, 687 F.3d at 69.  Here, the Court concluded that Penobscot Metro has standing to make ADA claims on behalf of its methadone patients and thus the ADA does assist the patients in this case.

The Court views Bangor's ordinance as facially violating these provisions. The courts have written that these regulations generally do not require a public entity to alter neutral regulations, but they do require a public entity to avoid excluding or otherwise denying persons with disabilities equal services, programs, or activities because of a disability, or refusing to make reasonable modifications to its regulations to avoid such discrimination unless the modification would fundamentally alter the nature of the program. *Compare DeBord v. Bd. of Educ.*, 126 F.3d 1102 (8th Cir. 1997) (school district did not violate ADA by refusing to administer medication to a student with attention deficit hyperactivity disorder in amounts in excess of the recommended daily allowance in the Physicians' Desk Reference because the school policy was neutral and the school district did not treat the student differently from others), *with Bryson v. Vailas*, No. 99-558-M, 2004 U.S. Dist. LEXIS 5180, at *6 (D.N.H. Mar. 26, 2004) ("Under the ADA, the State is obligated to make reasonable modifications in its program . . . as necessary to avoid discrimination on the basis of disability (i.e. unjustified institutionalization), unless it can establish that making requested modifications would fundamentally alter the nature of the service, programs or activity").

Accepting Bangor's distinction between zoning and licensing, it is difficult to understand why Bangor contends that it may legally achieve through licensing what it could not through zoning. The circuit court opinions that address facial discrimination against methadone clinics are not grounded on legal principals unique to a municipality's zoning authority. They are instead bottomed on municipalities

doing what municipalities do.  As the Ninth Circuit pointed out in *Bay Area*, "Title II of the ADA addresses the provision of public services."  179 F.3d at 730.  Indeed, § 12132 does not mention zoning ordinances, it speaks of "the benefits of the services, programs, or activities of a public entity," and municipal licensing is a municipal activity.  In *Innovative Health Systems*, the Second Circuit observed that the dictionary definition of "activity" is a "natural or normal function or operation" and that making zoning decisions is "a normal function of a governmental entity."  117 F.3d at 44.  So is municipal licensing.  Moreover, § 12132 goes on to provide that a qualified individual may not "be subjected to discrimination by any such entity."  Again, for the ordinance to single out methadone clinics and devise special rules to apply to them, as opposed to all other types of clinics, is facially discriminatory.  *Kelley*, 973 F. Supp. 2d at 38 ("Title II's regulations establish that public entities may not administer licensing programs in 'a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability'") (quoting 28 C.F.R. § 35.130(b)(6)).

Bangor's second line of defense is that the state of Maine Department of Health and Human Services (MDHHS) has exactly the same licensing procedures for methadone clinics.  *Def.'s Opp'n* at 7 (citing *id.* Attach. 3, *State of Me. Dep't of Health and Human Servs. Regs. For Licensing and Certifying of Substance Abuse Treatment Programs* § 19.8.3.1-4) (*MDHHS Regs.*).  In fact, Assistant City Solicitor Paul S. Nicklas stated that Bangor "based the requirements found in § 93-5, Conditions for

Approval, on the State of Maine's regulations for licensing opioid treatment programs." *Id.* Attach. 4, *Decl. of Paul Nicklas* ¶ 2 (*Nicklas Decl.*).

But as Penobscot Metro points out, unlike Bangor's ordinance, the MDHHS regulations permit licensed clinics to serve up to 500 patients without the need for a special waiver. *Pl.'s Reply* at 1. Section 19.8.4.3 of the MDHHS regulations states that opioid treatment programs "shall limit their program size to no more than 500 clients at each licensed/certified site, unless a waiver is granted." *MDHHS Regs.* § 19.8.4.3. In fact, Penobscot Metro received all state certifications, including MDHHS approval, to operate a clinic to serve up to 500 patients. *See Pl.'s Mot.* Attach. 3, *Decl. of James Scully* ¶¶ 7, 16. Furthermore, as Penobscot Metro observes, if Bangor's ordinance is facially discriminatory, Bangor gains little by pointing out that the MDHHS's regulations are also facially discriminatory. *Pl.'s Reply* at 2.

Moreover, although Bangor asserts that its ordinance is "virtually identical" to the state of Maine's regulation, *Def.'s Opp'n* at 3, there is an important distinction between the two. In contrast with the Bangor regulations, the Maine regulations address "opioid treatment programs," which are defined under Maine regulations. *MDHHS Regs.* § 1.50 ("Opioid Treatment Program (OTP): An OTP is any treatment program certified by the federal Substance Abuse and Mental Health Services Administration (SAMHSA) in conformance with 42 Code of Federal Regulations (C.F.R.), Part 8, to provide supervised assessment and MAT for clients who are opioid addicted"); *see* 42 C.F.R. § 8.2 ("Opioid treatment program or 'OTP' means a program or practitioner engaged in opioid treatment of individuals with an opioid agonist

treatment medication registered under 21 U.S.C. [§] 823(g)(1)").  Maine regulations
also define "MAT" or medication assisted treatment:

> MAT is any treatment for addiction and COD [Co-Occurring Disorder]
> that includes medication (e.g. psychotherapeutic medications,
> methadone, buprenorphine, naltrexone, accomprosate, vivitrol).  MAT is
> intended to help stabilize addiction and COD symptoms.

*MDHHS Regs.* § 1.45.  Under federal regulations, two opioid treatment medicines,
methadone and Levomethadyl acetate (LAAM), are available only at OTPs; whereas,
Subutex (buprenorphine), Suboxone (buprenorphine and naloxone), and Naltrexone
are available at OTPs, physician offices, and other health care settings.  *See
SAMHSA/CSAT Treatment Improvement Protocols, Medication-Assisted Treatment
for Opioid Addiction in Opioid Treatment Programs*, ch. 3, ex. 3-1 (2005).

Thus, in regulating only chemical dependency treatment clinics that provide
methadone maintenance therapy, Bangor elected only to affect methadone among a
series of medications available to treat opioid dependence.  To state the obvious,
methadone patients do not prescribe methadone for themselves; they are prescribed
this treatment protocol by a medical professional, who chose methadone among
available alternative therapies.  There is no evidence in this record that would justify
separating out for special regulation clinics that provide methadone as a therapy as
opposed to other types of opioid dependence medication.  In fact, during the City
Council discussion on Penobscot Metro's application, one of the Councilors remarked:
"There are some people, we hope, who would be appropriate for Suboxone treatment.
We'd like to see that number grow."  *Def.'s Opp'n* Attach. 6, *Partial Tr. of Bangor City
Council Special Meeting* 42:18-20 (Aug. 1, 2016).

Under Bangor's ordinance, for example, a physician's office next door to Penobscot Metro's clinic would be free to dispense Suboxone to opioid dependent patients without complying with Chapter 93 of the Bangor ordinance, yet Penobscot Metro because it dispenses methadone, a different, but equally legal type of opioid treatment medication, would be subject to Chapter 93. Without some justification, to single out methadone for regulation corroborates Penobscot Metro's contention that Bangor's ordinance is based on anecdotal evidence, on stereotypes about the type of people who are prescribed methadone (as opposed to other opiate-based medication treatments, such as Suboxone), and on community fears about people suffering from opiate-based drug addiction. In short, based on a plain reading of Bangor's ordinance, the singling out of methadone for special regulation is facially discriminatory in violation of the ADA and the Rehabilitation Act.

The Court concludes that its provisions facially discriminate against methadone clinics in violation of the ADA and Rehabilitation Act and that Penobscot Metro has demonstrated a likelihood of success on this issue.

### b.    Discriminatory Prejudice

The Court's conclusion that the city of Bangor ordinance is facially discriminatory is sufficient to conclude that Penobscot Metro has a likelihood of success on the merits, and therefore the Court does not reach the second issue: whether Bangor applied its ordinance in a discriminatory manner. *See Innovative Health Sys.*, 117 F.3d at 49 (A municipality may not base its decision on "discriminatory comments about drug- . . . dependent persons based on stereotypes

25

and general, unsupported fears" and at the same time, a city "certainly may consider legitimate safety concerns in its zoning decisions").

### C.   Potential for Irreparable Harm

The burden to establish irreparable harm rests on Penobscot Metro. *EEOC*, 94 F.3d at 742. "[I]n order to make a suitable showing of irreparable injury, the moving party must establish a colorable threat of immediate injury and the absence of any adequate remedy at law for such injury." *B&B Coastal Enters., Inc. v. Demers*, 245 F. Supp. 2d 265, 268 (D. Me. 2002) (internal citations omitted).

Here, Penobscot Metro argues that its task is made easier because it is proceeding under the ADA, which, it maintains, is a civil rights statute and therefore a violation of the statute is presumed to cause irreparable harm. *Pl.'s Mot.* at 18-19. Based on First Circuit authority, the Court agrees with the first part of Penobscot Metro's argument, namely that the ADA is a civil rights statute. The First Circuit has written that "[t]he ADA is a federal civil rights statute, enacted 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Jacques v. Clean-Up Grp., Inc.*, 96 F.3d 506, 510 (1st Cir. 1996) (quoting 42 U.S.C. § 12101(b)(1)); *Theriault v. Flynn*, 162 F.3d 46, 47-48 (1st Cir. 1998).

It is less clear, however, whether a violation of the ADA eliminates the irreparable harm requirement. *Compare Moteles v. Univ. of Penn.*, 730 F.2d 913, 918 (3rd Cir. 1984) (a plaintiff must show irreparable harm in a Title VII employment discrimination case), *with EEOC v. Cosmair Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987) ("[W]hen a civil rights statute is violated, irreparable

injury should be presumed from the very fact that the statute has been violated")
(internal citation omitted).   The First Circuit has not directly addressed whether a
court should presume irreparable harm where there is a violation of the ADA, but it
suggested that unless a statute expressly limits a court's discretion in issuing
injunctions, a court cannot dispense with the irreparable harm requirement, even in
the context of civil rights statutes.  *See EEOC v. Astra*, 94 F.3d at 742-43.   Because
nothing in the ADA limits a court's discretion in issuing injunctions, the Court will
proceed with the irreparable harm analysis.  *See* 42 U.S.C. § 12133; 29 U.S.C. § 794a.

The record confirms that Penobscot Metro itself has not only failed to
demonstrate that it has suffered irreparable harm from the denial of its expansion
application, but it has also failed to demonstrate that its clients will.   It is true that
Lisa Davis of Penobscot Metro stated in a sworn declaration that "[w]ithout access to
methadone treatment, recovering addicts are at serious risk for exposure to addictive
drugs, potentially resulting in death, illness or permanent disability, and
significantly impairing their participation in major life activities."  *Davis Decl.* ¶ 20.
Although Bangor objected to Ms. Davis' declaration as "speculative," *Def.'s Opp'n* at
11, it presented no evidence to rebut her statement, and the Court takes as a matter
of common sense that if an opiate addict is completely deprived of methadone
treatment, he or she could suffer a variety of irreparable harms.

However, Bangor argues that the patients are not completely deprived of
treatment because they can travel to other treatment centers.   It cited *Tri-Cities
Holdings LLC v. Tennessee Health Services and Development Agency*, 598 F. App'x

404 (6th Cir. 2015) for the proposition that a "lack of immediate availability of methadone treatment and requiring opiate addicts to travel to treatment [were] not sufficient to show irreparable harm." *Def.'s Opp'n* at 12.  But the Sixth Circuit wrote in *Tri-Cities* that the plaintiffs conceded that "treatment is available, even though they must drive some distance to reach a clinic."  598 F.3d at 411.  In contrast, Penobscot Metro has not conceded that treatment is available, maintaining that patients would remain on a waitlist if the Court denied injunctive relief.  *Pl.'s Reply* at 5.[2]

In response, Bangor objected to Penobscot Metro's calculation of the number of potential patients and the availability of slots at other local methadone clinics.  *Def.'s Opp'n* at 12-13.  The Court finds this point persuasive.  Penobscot Metro applied to increase its patient capacity by 200 slots.  *Davis Decl.* ¶ 14 ("Penobscot Metro applied for an increase in its treatment slots from 300 to 500").  At the July 11, 2016 City Council meeting, Penobscot Metro was asked to provide additional detail concerning the 173 individuals on its waitlist.  *Id.* ¶¶ 14-15.  In response, Penobscot Metro contacted sixty people who "reaffirmed their desire to enter treatment at Penobscot

---

[2]        Bangor also cited *A Helping Hand, LLC v. Baltimore County*, 355 F. App'x 773 (4th Cir. 2009) for the proposition that a methadone clinic could not demonstrate that "a temporary interruption would irreparably frustrate its customer-service purpose." *Def.'s Opp'n* at 12.  But *A Helping Hand* is a much different case.  The clinic in *A Helping Hand* was in an area of the city of Baltimore where such clinics were prohibited, but there were other areas within the city that it could operate and the ordinance allowed for a six-month amortization that permitted the clinic to continue to operate as it moved. 355 F. App'x at 774.  Moreover, the clinic's claim of irreparable damage was based on "damage to a business's property interests," and the clinic did not expressly raise the question of harm to its methadone clients.  *Id.* at 777.  In *A Helping Hand*, the Fourth Circuit concluded that the clinic had not demonstrated that a "*temporary* interruption would *irreparably* frustrate its customer-service purpose." *Id.* at 776 (emphasis in original).  Unlike *A Helping Hand*, Bangor has not asserted that it would approve Penobscot Metro's application if it located to a different area within the city, and Penobscot Metro has specifically raised the impact of the denial of its application on its clients.

Metro." *Id.* ¶ 15.  However, Assistant City Solicitor Paul Nicklas' sworn declaration dated September 16, 2016 stated:

> As of June 27, 2016, Discovery House-Bangor was licensed to provide treatment to 700 patients, and had 144 treatment slots available under its State license.  Similarly, Acadia Healthcare, Inc. was licensed to provide treatment to 500 patients and had 14 treatment slots available under its State license.

*Nicklas Decl.* ¶ 5.  This evidence suggests that there is immediate treatment available in Bangor for most, if not all, of the patients on Penobscot Metro's waitlist.  Therefore, even if the Court does not grant the preliminary injunction, the record indicates that the sixty identified patients can obtain local treatment with other providers. Penobscot Metro has not offered contrary evidence explaining why these other treatment facilities in Bangor would not be sufficient.  Therefore, the Court concludes there is no irreparable harm to Penobscot Metro's patients.  Once the specter of irreparable harm to Penobscot Metro's patients is removed from the equation, the Court is left with harm to Penobscot Metro itself, which is "damage to a business's property interests" and not irreparable harm calling for equitable relief.  *See A Helping Hand*, 355 F. App'x at 777.

The Court returns to Penobscot Metro's point about the presumption of irreparable harm flowing from a violation of a civil rights statute.  On this point, Penobscot Metro's argument presents a Catch-22[3] logic: (1) the Court must presume irreparable harm from a violation of the statute, (2) there is no proven irreparable harm to the Plaintiff justifying the requested relief, but (3) the Court should grant

---

[3]    JOSEPH HELLER, CATCH-22 (1961).

the requested relief to the Plaintiff because the Court must presume irreparable harm. Absent some evidence of irreparable harm to Penobscot Metro's patients or to Penobscot Metro itself, however, the Court declines to issue an injunction against the operation of the ordinance that would have the practical effect of presuming irreparable harm, where none has been demonstrated. Although Penobscot Metro has not requested that the Court issue a declaratory judgment concerning the legality of the ordinance, its request for injunctive relief, absent evidence of irreparable harm, strikes the Court as a prayer for a declaratory judgment in the guise of a demand for an injunction.

The potential mischief is apparent. If Bangor quickly amended the ordinance to cure its flaws, there is no guarantee that Penobscot Metro would be entitled to expand its methadone program based on non-discriminatory criteria. To grant the requested injunctive relief to Penobscot Metro, namely ordering that it is not bound at all by the ordinance, would substitute the judgment of this Court for the judgment of the City Council on matters unrelated to the ADA.

Based on the evidence in this record, the Court concludes that even though Penobscot Metro demonstrated a likelihood of success on the merits of its claim, it has failed to demonstrate any irreparable harm and therefore its motion for injunctive relief must fail. In order to be entitled to the extraordinary relief of an injunction, Penobscot Metro has the burden to establish each of the four *Bl(a)ck Tea Society* factors: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant]; (3) the balance of the relevant impositions, i.e., the

hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest*." Esso Standard Oil*, 445 F.3d at 17-18 (quoting *Bl(a)ck Tea Soc'y*, 378 F.3d at 11).  As Penobscot Metro failed to demonstrate irreparable harm, the Court will not address the remaining two criteria for injunctive relief.

## V.     CONCLUSION

The Court DENIES Plaintiff Metro Treatment of Maine LP, d/b/a Penobscot County Metro Treatment Center's Motion for Preliminary Injunction (ECF No. 3).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 15th day of November, 2016